## HEARD *v.* THE STATE.

1. The General Assembly may, without regard to the population of a particular city, establish therein a "city court," and prescribe that a writ of error shall lie therefrom to the Supreme Court. LITTLE, J., dissenting.

2. Overruling a demurrer to an indictment is not cause for a new trial.

3. Though an indictment for keeping and maintaining a disorderly house charges, conjunctively, that so doing was to the encouragement of divers specified vices, a conviction based upon evidence showing that the accused kept and maintained such a house to the encouragement of any one or more of such vices is maintainable.

Argued January 21,—Decided May 27, 1901.

Indictment for disorderly house. Before Judge Hodnett. City court of Carrollton. December 20, 1900.

*Talbot Smith* and *Oscar Reese*, for plaintiff in error.
*Sidney Holderness, solicitor,* contra.

LUMPKIN, P. J. 1. On the call of this case counsel for the State moved to dismiss the writ of error, on the ground that this court had no jurisdiction to entertain the same, because Carrollton, being a city of less than two thousand inhabitants, was not one in which there could constitutionally be established a city court whose judgments could be reviewed upon a direct bill of exceptions therefrom to the Supreme Court. We have not referred to the United States census to ascertain what was the population of Carrollton, either when it was incorporated as a city or when the city court of Carrollton was established. In the view which we feel constrained to take of the question presented by the motion to dismiss, it may be conceded that the population of Carrollton has never exceeded two thousand. While, as was pointed out by Mr. Justice Little in *Wight* v. *Wolff*, 112 *Ga.* 169, there is, according to lexicographers, a marked distinction between a city and a town—the former being "more important" than the latter—we are driven to the conclusion that from the standpoint of legislation in this State the distinction has ever been purely arbitrary, and the test of population has never

been observed.   Our General Assembly has time and again, long before the ratification of our present constitution, incorporated as cities places whose inhabitants were counted by mere hundreds, and perhaps many more places having therein a limited number of thousands of people.   The truth of this statement is matter of such general knowledge that it is not necessary to cite numerous illustrations.   It will suffice to refer to the cases of Atlanta and Savannah, the two cities expressly named in the constitution as those from whose city courts there may be writs of error to the Supreme Court. The former was incorporated as a city in 1847, when its estimated population was about 1,500.   It was in point of fact a small town, in the proper sense of the term.   While it had prospects of growth, and did grow apace, and continues to grow, its legal status as a city would not have been changed if it had failed to grow.   Savannah was made a city by the act of December 23, 1789.   Its population must have been small at that early day; for, according to Sherwood's Gazetteer (2d ed.), it had in 1829, forty years later, "about 7,000."   These two instances, and scores of others which might be mentioned, show conclusively that our legislatures have paid no attention to the definitions given in lexicons of the terms "city" and "town," or to the real difference between a city and a town.   This being so, and "there being," as Mr. Justice Cobb remarked in the case cited supra, "nothing in the constitution defining a 'city,' it was left entirely to the General Assembly to say what community of persons should be declared to be a city, and the General Assembly may arbitrarily determine this question.   This discussion might be closed·here; but we wish to add that though we can not, in view of what is said above, hold otherwise than as we do, we are profoundly impressed with the belief that the framers of the constitution never intended or contemplated that villages and towns should be arbitrarily converted by mere legislation into cities for the purpose of establishing therein "city courts," and giving them writs of error to the Supreme Court.   That our present Governor was impressed with the same idea is evidenced by his last annual message to the General Assembly.   The following extract therefrom fully and clearly expresses what we can not help feeling is the real truth of the matter:

"In view of the large number of acts, passed within recent years, purporting to establish city courts with direct writs of error to the

Supreme Court, the inquiry is suggested whether there is not danger of carrying legislation on this line beyond constitutional limits—if, indeed, this has not already been done.   While it may be within the power of the General Assembly to arbitrarily declare that a mere village or small town shall, from and after the passage of a particular act, be 'a city,' this certainly does not make the same a real city, as the term is commonly used and understood among our people; and if this sort of a legislative declaration is made with reference to a particular village or town for the sole purpose of laying the foundation for establishing in the newly-created and so-called city a court whose judgments may be directly reviewed by the Supreme Court, the constitutionality of the measure may, as to this matter, well be questioned.   Paragraph 5 of section 2, article 6 of the Constitution (Civil Code, § 5836) declares:   'The Supreme Court shall have no original jurisdiction, but shall be a court alone for the trial and correction of errors from the superior courts, and from the city courts of Atlanta and Savannah, and such other like courts as may be hereafter established in other cities.'   Our present constitution was ratified by the people December 5, 1877.   At that time, Atlanta and Savannah were the two largest cities in the State, and each had many thousands of inhabitants.   In each was a city court with broad jurisdiction and large powers.   It can not be doubted that the framers of the constitution, in limiting the jurisdiction of the Supreme Court to the correction of errors committed by the superior courts, by the two city courts mentioned, and by 'such other like courts' as might be established, meant that the phrase just quoted should apply to courts of a class having similar jurisdiction and powers with those already established in Atlanta and Savannah.   It also seems clear that in declaring that these 'other like courts' must, in order to come within the provisions of this paragraph, be 'established in other cities,' it was contemplated that they should be established in *like* cities, *i. e.*, real cities, at least approximating in population and general characteristics the two existing cities specially named.   In other words, the makers of the constitution must have had in mind cities whose size, importance, wealth, business, and litigation would render expedient or necessary the establishment therein of courts of like dignity and authority with the superior courts, save only as to matters over which the jurisdiction of the latter was by the fundamental law made exclusive.

"It can not be fairly supposed that in using the language above quoted it was believed that the General Assembly would ever attempt to so stretch its obvious meaning as to enact that a small town should immediately become a city, and, as such, be entitled to a constitutional city court. It is respectfully suggested that the time has come to call a halt in legislation tending in this direction; for it is surely the duty of the lawmaking power to conform not only to the letter, but to the spirit of the constitution."

Much of the opinion delivered by Mr. Justice Little in the case above mentioned is on the same line. He sets forth with great strength, force, and clearness the reasons why it is not to be supposed that the convention meant to authorize the General Assembly to establish "city courts" in municipalities of small population and limited business, with writs of error therefrom to this court. Those reasons need not be repeated here. All of us, including even Mr. Justice Cobb and Mr. Justice Fish, who were not, for the reasons stated by the former, able to assent to all of the propositions laid down in that opinion, felt then, and feel now, that from a moral standpoint the truth had been told therein. Four of us were also persuaded that when the question now before us arose, as was anticipated, this same truth could be made apparent from the standpoint of constitutional interpretation. After anxious deliberation, all of us except Mr. Justice Little are now forced to the conclusion that this can not be done. While strongly believing that legislation like that under consideration violates the spirit of the fundamental law, and therefore gravely doubting the constitutionality of many of the city-court acts, including that relating to Carrollton, in so far as they authorize writs of error, we can not, because of this doubt, adjudge that they are, in the respect indicated, null and void. Mere doubt as to the constitutionality of a given enactment settles its validity.

The motion to dismiss the writ of error must be overruled.

2. The accused was tried for keeping and maintaining "a common, ill-governed, and disorderly house," upon an indictment which had been transferred to the city court from the superior court of Carroll county. Before pleading the merits, she filed a demurrer to the indictment, which was overruled. After conviction, she made a motion for a new trial, in one ground of which she complained of the overruling of the demurrer. The denial of this motion is the

only error assigned in the bill of exceptions, and the accused did not, otherwise than as above stated, attempt to bring to this court for review the refusal of the trial court to sustain the demurrer. It is now well settled that overruling a demurrer to indictment is not ground for a new trial. *Taylor* v. *State*, 105 *Ga.* 847 (3); *Gaines* v. *State*, 108 *Ga.* 772; *Cleveland* v. *State*, 109 *Ga.* 265.

3. Though there are in the motion for a new trial fourteen grounds, counsel for the plaintiff in error, who argued the case here exclusively by brief, did not insist upon, or even mention, any of them save that which is disposed of above and two others, one alleging that the verdict was contrary to the evidence and the other reading as follows: "Because the verdict is contrary to the evidence and the law and totally without evidence, there not being one scintilla of evidence showing that there was any keeping and maintaining a common ill-governed house by deft. to the encouragement of idleness, drinking, and gaming, collectively, and all must have been proved as alleged." The code section on which the indictment was based reads as follows: "Any person who shall keep and maintain, either by himself or others, a common, ill-governed, and disorderly house, to the encouragement of idleness, gaming, drinking, or other misbehavior, or to the common disturbance of the neighborhood or orderly citizens, shall be guilty of a misdemeanor." Penal Code, § 392. The exact charge which the indictment made against the accused was that she "did keep and maintain a common, ill-governed, and disorderly house to the encouragement of idleness, gaming, and drinking, to the common disturbance of the neighborhood and orderly citizens." The evidence as a whole warranted the jury in finding that the accused kept and maintained a house which was "ill-governed and disorderly," in the sense in which the words are usually understood; that she did so for a sufficient length of time to render applicable to it as a disorderly house the descriptive term "common," and that the noises made and improper acts committed therein disturbed the peace and comfort of quite a number of orderly citizens in the neighborhood. In all these respects, the testimony for the State met the requirements of the rule laid down in *Palfus* v. *State*, 36 *Ga.* 280, to the effect that: "To constitute a house a disorderly house in law, the noises, &c., must be *ordinary and usual, or common*, and the disturbance must be *general*, and not of only *one* person in a thickly settled neighborhood." There was some evidence

authorizing the conclusion that the manner in which the house was kept was calculated to encourage idleness and drinking, but no evidence at all that it had a tendency to encourage the vice of gaming. So the question for decision is narrowed down to this: Did the failure of the State to prove that the keeping of the house had every one of the vicious tendencies ascribed to it in the indictment render the verdict unlawful? We think not.

If it was, in fact, a "common, ill-governed, and disorderly" establishment, and the keeping and maintenance of it encouraged idleness, or gaming, or drinking, or other misbehavior, the keeper was guilty of a misdemeanor. So was she if she kept and maintained the house in such manner as to cause "common disturbance of the neighborhood or orderly citizens." In prescribing what consequences must result from the keeping of a disorderly house in order to render the act of so doing criminal, the law mentions them disjunctively. The indictment charged, conjunctively, that all of these consequences, save only the encouragement of "misbehavior" other than idleness, gaming, and drinking, resulted in the present instance. Must the conviction fall because there was no proof as to the encouragement of gaming? It was certainly not necessary to allege anything with respect to this point; and if the indictment had been silent on the subject, no evidence concerning it would have been called for. The general rule is that the State will be required to prove all facts alleged, even though immaterial and not such as it was necessary to set forth in the indictment. This rule, however, usually relates to facts which identify the transaction under investigation and serve to distinguish the criminal act charged from any other of a similar nature. In the present case the act charged was the keeping of a disorderly house. To the evidence tending to prove that the accused did keep in a disorderly manner a particular house nothing as to the identification of the house or as to the fact of her keeping it would have been added by showing that her conduct in maintaining the establishment was "to the encouragement of . . gaming." If the indictment had contained the unnecessary allegation that the house was a red house, the State would have been obliged to prove that it was "red," or else fail to make out its case. This is so because proof of every other allegation in the indictment, without proof that the house was of the color charged, would have left it uncertain whether the house

kept was the house to which the indictment referred.    An indict-
ment charging the larceny of an animal with certain ear-marks, or
·having a particular color, or belonging to a designated breed, can
not be sustained without proving the ear-marks, or color, or breed,
as alleged; for failure of proof in these respects would be failure
to identify beyond a reasonable doubt the animal which the grand
jury charged the accused with stealing.    So, the alleged burglary
of the house of A, number 225 Jackson street, would not be suffi-
ciently established by proving the burglary of a house of A on that
street, without proof as to number; for it might be that A had two
or more houses on that street, in which event the proof would not
establish with the requisite legal certainty that the house actually
burglarized was in fact the one with the number 225, to which
alone the indictment related.    If the indictment is not needlessly
specific, or no question as to its sufficiency in the matter of descrip-
tion is raised by demurrer, evidence general in its nature will sup-
port a charge alike general.

There is another class of cases wherein a conviction may stand
without literal proof of the charge as made.    Thus, on an indict-
ment for the larceny of ten sheep, the accused may be properly
found guilty upon proof satisfactorily showing that he stole one of
those sheep; or, on an indictment for embezzling five hundred dol-
lars, a conviction may stand on evidence showing the embezzlement
of any number of those dollars.    In cases of this kind the evidence
establishes the commission of an act, covered by the charge in the
indictment, the doing of which is a crime; and the evidence fixes
this very act as one to which the indictment referred.    Our pres-
ent case, on principle, falls within the latter class.    The criminal
act was the keeping of a particular house in a disorderly manner.
Both the house and the manner of keeping it were absolutely iden-
tified, and this is none the less true because one of the vicious ten-
dencies of the manner of keeping was not shown.    A second pros-
ecution for the disorderly keeping of this same house during the·
period covered by the present indictment would be barred; and this
is the real test.    As was remarked by Buller, J., arguendo, in
J'Anson v. Stuart, 1 T. R. 754, "the offense is the *keeping* of the
house."    The following from 7 Enc. Pl. & Pr. 17, seems to be
closely in point: "Under an indictment for keeping a disorderly
house, which charges in the same count the various manners in

which the house was disorderly, proof of any one of the manners. mentioned is sufficient." The case of People *v.* Carey, 4 Park. Cr. Rep. 238, cited in a note, directly supports the text. Under an English statute (23 & 24 Vict. c. 27, s. 32) which made it an offense for a licensed keeper of a refreshment house to "knowingly suffer prostitutes, thieves, or drunken and disorderly persons to assemble at or continue in or upon his premises," one Belasco, the keeper of such a house, was charged with knowingly suffering "prostitutes to assemble at and continue in and upon his said premises." The magistrate before whom the accused was tried found as matter of fact that he permitted a number of prostitutes to assemble in his house, that some of them were served with refreshments, and that "it did not appear that those prostitutes who were not seen to take refreshment tarried in the house for a longer time than would have been needful to procure refreshment, had such been their intention." Belasco was convicted, and on appeal the point was distinctly made that the facts found did not constitute an offense under the statute, because it was "not proved that the appellant knowingly permitted the prostitutes to remain in or upon his premises." The conviction was nevertheless affirmed, and Blackburn, J., said: "The magistrate has found, and has stated the evidence upon which he has found, that the women assembled on the appellant's premises in furtherance of prostitution; that was more than he need have found. It would have been sufficient if he had found that they had assembled in the capacity of prostitutes." Belasco *v.* Hannant, 3 B. & S. 13-20. The charge was permitting the lewd women to assemble *and remain* on the premises. The proof was that the accused merely permitted them to assemble. This case, therefore, which was apparently most carefully considered, supports our present ruling. We have been unable, after some search, to find other authorities in point, but have, after considerable reflection, reached the conclusion that the mere failure to prove that the keeping of the house tended to encourage gaming was not fatal.

   *Judgment affirmed. All the Justices concurring, except*

  LITTLE, J., dissenting. While conceding that the General Assembly may, without regard to the population of a particular city, establish a city court, I must dissent from so much of the judgment rendered in this case by my brethren as rules that the General As-

sembly may prescribe that a writ of error shall lie directly from such a court to the Supreme Court.    In respect to the last proposition in the first headnote I have to say that, for the reasons which I gave in the opinion rendered in the case of *Wight* v. *Wolff*, 112 *Ga.* 169, the constitutional provision which authorizes a writ of error from certain city courts contemplates that it shall issue only from a city court established in a place which is a city *in fact*, and not one which is a city only *in name*.    The latter the General Assembly may create; the former it can not.    While it may incorporate a place of ten inhabitants and call it a city, such a place, even after it is incorporated, is not a city except for legislative purposes, and the provision of the constitution prescribing from what city courts a writ of error will lie directly to this court deals with such cities as are real cities and not mere nominal cities.    The superior courts of this State are the only courts which by the constitution are invested with general original jurisdiction over all classes of cases.    From these writs of error lie directly to this court.    They do not lie directly from all city courts; and in giving the right of a direct bill of exceptions to suitors in certain city courts the constitution, without any doubt, as I think, prescribes that those city courts whose judgments may thus be directly reviewed are only those established in cities where the volume of business is large and the rights of suitors therein would be delayed if the ordinary remedies of certiorari and appeal were the exclusive methods by which their judgments might be reviewed; and in restricting this right to a writ of error, having this object in view, the constitution designates that the writ shall lie in those cases only where the cities in which they are established bear at least some resemblance to the leading cities in this State, both in population and business importance, to wit: Atlanta and Savannah.    To say that the writ shall lie from any city court established in a place which the legislature has made a city for legislative purposes is, in my opinion, an erroneous construction of the constitutional provision.    Not only so, but its effect is to take away the rightful jurisdiction of the superior court to correct by certiorari and appeal errors which may have been committed in such courts, and to impose upon the Supreme Court a burden never contemplated by the framers of the constitution.