### 6599.  FANNING v. THE STATE.

1. Even had it appeared that the intoxicating liquors offered in evidence
   were the fruits of an illegal and wrongful search of the premises of
   the accused, the evidence would nevertheless have been admissible, unless
   the accused had himself been compelled to furnish the incriminating evi-
   dence.  *Williams* v. *State*, 100 *Ga.* 511 (28 S. E. 624, 39 L. R. A. 269);
   *Evans* v. *State*, 106 *Ga.* 519 (32 S. E. 659); *Dozier* v. *State*, 107 *Ga.* 710
   (33 S. E. 418); *Duren* v. *Thomasville*, 125 *Ga.* 1 (53 S. E. 814).
2. To sustain an accusation charging the offense of keeping and maintain-
   ing "a common, ill-governed, and disorderly house, to the encouragement

of idleness, gaming, and drinking, to the common disturbance of the neighborhood and orderly citizens," it must appear that the house was in fact a "common, ill-governed, and disorderly" establishment, and that the keeping and maintenance of it encouraged idleness, or gaming, or drinking, or other misbehavior; or that the house was kept and maintained in such manner as to cause "common disturbance of the neighborhood or orderly citizens."

3. Since the evidence discloses no disorder, mere proof that several persons were found in the house, and that a considerable quantity of intoxicants was likewise found secreted therein, was insufficient to support the charge made in the indictment. The court therefore erred in overruling the motion for a new trial.

DECIDED OCTOBER 29, 1915.

Accusation of keeping disorderly house; from city court of Washington—Judge Wynne. May 1, 1915.

*W. A. Slaton, Colley & Colley,* for plaintiff in error.

*F. W. Gilbert, solicitor,* contra.

WADE, J. Section 383 of the Penal Code declares that "Any person who shall keep and maintain, either by himself or others, a common, ill-governed, and disorderly house, to the encouragement of idleness, gaming, drinking, or other misbehavior, or to the common disturbance of the neighborhood or orderly citizens, shall be guilty of a misdemeanor." The following general definition of the term "disorderly house" is given: "A disorderly house is a house in which people abide or to which they resort to the disturbance of the neighborhood or for purposes which are injurious to the public morals, health, convenience, or safety." 14 Cyc. 482. The same authority asserts that "The specific kinds of disorderly houses which are regarded in law as nuisances per se are bawdy-houses and gaming-houses," and that "a tippling house or a place where intoxicating liquors are sold is not a nuisance per se at common-law. It becomes a nuisance only when it is kept in a disorderly manner, to the annoyance of the neighborhood. A person who keeps such a place and allows drunken, disorderly characters to congregate in it who drink, curse, or use foul language, shout, and quarrel, by day or by night, is guilty of maintaining a nuisance." 14 Cyc. 484, 486, 487.

In *Palfus* v. *State,* 36 *Ga.* 280, it was held that "to constitute a house a disorderly house in law, the noises, etc., must be ordinary and usual, or common, and the disturbance must be general, and not of only one person in a thickly settled neighborhood." In the

decision in that case the Supreme Court said, that the charge of keeping a common, ill-governed, and disorderly house "could be maintained only by clear proof of the cursing and swearing, and loud and frequent noise, to have been in the rooms of defendant under his control; and then that they were common and usual, and were to the common or general disturbance of the neighborhood or orderly citizens. . . We apprehend that the legislature, in enacting this clause of the Code for the preservation of order and tranquility, designed to act upon criminally only such houses wherein loud noises, cursing, swearing, etc., were ordinary and usual, or common occurrences,—not casual and at long intervals, but were the general, customary, common habits (if we use such an .expression for illustration) of the house. These characteristics seem to us essential to fix upon a disorderly house the name of common. So, too, the noise or disorder must not disturb one person only in a thick or populous neighborhood; it must disturb it generally, or it can not be said of it to have been to the common disturbance of the neighborhood or orderly citizens."

Quite a distinction exists between "disorderly conduct" in violation of a municipal ordinance and keeping a "disorderly house" in violation of section 383 of the Penal Code. A majority of this court held in *Garvin* v. *Waynesboro*, 15 *Ga. App.* 633 (84 S. E. 90), that loud talking and noise which disturbed one person only might constitute "disorderly conduct," within the meaning of a municipal ordinance similar to .the one there under review. It appears from the *Palfus* case, supra, that to constitute the disorder referred to in section 383 of the Penal Code, the noises, etc., must give annoyance to *more* than one person.

In a lucid discussion of this section of our Penal Code, in *Heard* v. *State*, 113 *Ga.* 444 (39 S. E. 118), the Supreme Court cited the *Palfus* case with approval, and clearly recognized that noise is one of the essential elements to constitute a house a "disorderly house" under this section. The court said: "The evidence as a whole warranted the jury in finding that the accused kept and maintained a house which was 'ill-governed and disorderly,' in the sense in which these words are usually understood; that she did so for a sufficient length of time to render applicable to it as a disorderly house the descriptive term 'common,' and that the noises made and the improper acts committed therein disturbed the peace

and comfort of quite a number of orderly citizens in the neighborhood." From that decision it is clear that in order to sustain a charge of this character, it must appear first that the house was a common, ill-governed, and disorderly establishment, and further that the keeping and maintenance of it encouraged idleness, or gaming, or drinking, or other misbehavior; or else that the house was kept and maintained in such a manner as to cause common disturbance of the neighborhood or orderly citizens. As was said by the court in that case: "In prescribing what consequences must result from the keeping of a disorderly house in order to render the act of so doing criminal, the law mentions them disjunctively." Further in the same case it was said that "the criminal act was the keeping of a particular house in a disorderly manner," and if it be shown that the house was kept in a disorderly manner, and further that the keeping and maintenance of it encouraged either idleness, or gaming, or drinking, etc., then the crime would be established. So it is apparent that as a basis for a conviction under this section of the Penal Code, it must first be shown that the house was kept in a disorderly manner, and then, in addition, that it was so kept to the encouragement of idleness, or gaming, or drinking, etc., or was kept in a disorderly manner, which resulted in the common disturbance of the neighborhood or orderly citizens.

In the case under consideration the evidence in behalf of the State showed no disorder of any kind whatsoever. The defendant lived alone in the house, and on a certain Sunday afternoon two policemen were passing through the section of the town where he lived, looking for dogs which had not been tagged in conformity with the city ordinance; and when they neared his house they left the vehicle in which they were riding, and, approaching the house, found that the door was locked; they heard voices in the house, and one policeman went around to the back door and the other knocked on the front door without eliciting any response, though they "heard some moving around in the house." The back door was then partly opened and the defendant and three other negroes made their appearance. One of the officers inquired of the negroes, "What is up?" They replied, "Nothing," and invited the officers in. The officers entered the house and inquired if there was any liquor there, and the defendant answered that there was not, and proposed to the officers to look for it,

if they did not believe his statement. The officers found on a table or stand by the side of the closet a water-glass, a whisky-glass, and an empty whisky-bottle, a funnel, a corkscrew, and some empty pasteboard boxes similar to those used for the shipment of liquor-bottles. In the closet six or seven quarts of corn whisky and a gallon jug containing rye whisky were found; and in an old trunk two or three bottles of beer were discovered. One of the officers pulled off a board from the ceiling, and behind this plank four or five quart-bottles of corn whisky were found. Seven bottles of beer were found in a sack on the floor, a lot of playing-cards on a pile of cottonseed in the corner, and a lot of paper covers, used to wrap around beer-bottles, were scattered around on the floor. One of the witnesses testified that he had frequently been in the neighborhood of the defendant's place of residence within "the last year or two," and whenever he was there he would see two or three men there, or meet them going to or coming from the direction of this house. Another witness testified that about a month before the discovery of the whisky by the policemen he had seen one person go into the defendant's house and take a drink out of a bottle on a table there, but that on a number of other occasions he went by the place and he had never seen any other drinking there. There was testimony that many people had been seen going towards the defendant's house, but no testimony to show how many of these persons stopped at or entered the house. The evidence further disclosed that a much frequented path, which constituted a short route between two streets or roads, led by the defendant's house. There was absolutely no testimony going to show that there had ever been any noise or disorder at the house; and, conceding that the quantity of whisky found in the house indicated that it may possibly have been maintained to the encouragement of idleness and drinking, the first element necessary to constitute a violation of this section of the code was lacking.

Had there been proof of any noisy conduct or disorder, the quantity of intoxicants found and the presence of three men besides the accused in a locked house in the daytime and during the spring season, when it is not necessary to remain in a house for warmth, as well as the presence of scattered playing-cards, would have been suspicious circumstances, and might have authorized the inference that the house (if first shown to have been kept or main-

tained in a disorderly manner) was kept for the purpose of encouraging idleness, or drinking, or gaming, and a·conviction perhaps might have been warranted. The evidence, however, failed to disclose that any gambling or drinking had been indulged in on the occasion when the officers found the accused and three other men in the locked house; and certainly it can not be said their presence in the house during the daytime indicated that the house was maintained to encourage idleness, as they were found in company with the defendant on Sunday afternoon, when under the law idleness is encouraged and not reprehended. So, too, there is no circumstance to indicate that drinking was regularly or frequently practiced or countenanced in the house of the defendant, or that he had ever permitted any gambling whatever, as the cards found may have been casually dropped by one of his guests at the time of the search. We do not think, in the light of the clear ruling in the *Heard* case, supra, that the conviction could be sustained under the decision in *Thrower* v. *State,* 117 *Ga.* 753 (45 S. E. 126).

The evidence adduced tends to indicate that some other penal statute was perhaps violated by the accused, but does not sustain the particular charge preferred against him. Therefore the trial judge erred in overruling the motion for a new trial.

*Judgment reversed.*